UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DISTRICT HOSPITAL PARTNERS,      :
L.P. d/b/a GEORGE WASHINGTON     :
UNIVERSITY HOSPITAL, et al.,     :
                                 :
          Plaintiffs,            :
                                 :
     v.                          :     Civil Action No. 11-1717 (GK)
                                 :
KATHLEEN G. SEBELIUS,            :
Secretary of the United          :
States Department of Health      :
and Human Services,              :
                                 :
          Defendant.             :
                                 :

### MEMORANDUM OPINION

Plaintiffs are a group of commonly owned hospitals that participate in the Medicare program. They bring this action against Kathleen Sebelius in her official capacity as Secretary of the Department of Health and Human Services ("Defendant" or "Secretary") after the Secretary disallowed various Medicare bad debts claimed by Plaintiffs in the fiscal years ending in 2003, 2004, and 2005. Plaintiffs challenge that decision pursuant to the Medicare Act, 42 U.S.C. § 1395 et seq. ("the Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

This matter is before the Court on Plaintiffs' Opening Brief [Dkt. No. 14], which this Court construes as a Motion for

Summary Judgment,[1] Defendant's Motion for Summary Judgment and Opposition to Plaintiffs' Opening Brief [Dkt. No. 19], Plaintiffs' Opposition and Reply Brief [Dkt. No. 22], and Defendant's Reply to Plaintiffs' Opposition and Reply to Defendant's Motion for Summary Judgment [Dkt. No. 28]. Upon consideration of the briefs, the administrative record, and the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Summary Judgment is **granted** and Defendant's Motion for Summary Judgment is **denied**.

## I.   BACKGROUND

### A.   Statutory and Regulatory Framework

#### 1.   The Medicare Program

Title XVIII of the Social Security Act established the Medicare program, which provides medical care for the elderly and disabled. 42 U.S.C. § 1395 et seq.; see also Kaiser Found. Hosps. v. Sebelius, _ F.3d _ , 2013 WL 791272, at *1 (D.C. Cir.

---

[1] The parties debate whether the Plaintiffs' Opening Brief should be construed as a motion for summary judgment. Compare Pls.' Opp'n & Reply Br. 2 n.2 [Dkt. No. 22], with Def.'s Reply to Pls.' Opp'n & Reply to Def.'s Mot. for Summ. J. 3 n.2 [Dkt. No. 28]. Plaintiffs acknowledge that judicial review of this case is under the APA. Pls.' Opp'n & Reply Br. 2 n.2. They also acknowledge that the entire case will be resolved based on the briefs and the administrative record. See Joint Mot. to Set a Briefing Schedule 2 [Dkt. No. 12]. Thus, this case is being decided as a matter of law, and summary judgment is the "appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record." Richards v. I.N.S., 554 F.2d 1173, 1177 (D.C. Cir. 1977).

Mar. 5, 2013) (citation omitted). The Medicare program is administered by the Secretary of Health and Human Services through the Center for Medicare and Medicaid Services ("CMS"). Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006). Medicare providers enter into written agreements with the Secretary to provide services to eligible individuals. 42 U.S.C. § 1935cc. Fiscal intermediaries, private companies that process payments on behalf of CMS, then make interim payments to providers, subject to subsequent adjustments. 42 U.S.C. § 1395h.

To calculate these adjustments, providers are required to submit an annual cost report to their fiscal intermediary identifying total costs incurred during the course of the fiscal year. 42 C.F.R. §§ 413.20, 413.24. Fiscal intermediaries then analyze and audit the cost report and inform the provider of a determination of the amount of total Medicare reimbursement to which they are entitled, referred to as the notice of amount of program reimbursement ("NPR"). 42 C.F.R. § 405.1803; see also Regions Hosp. v. Shalala, 522 U.S. 448, 452 (1998).

If a provider is dissatisfied with the intermediary's final determination of its NPR, and if the provider meets the requirements set forth in 42 U.S.C. § 1395oo(a), the provider may appeal the determination to the Provider Reimbursement

-3-

Review Board ("PRRB"). 42 U.S.C. § 1395oo(a)(1)(A)(ii). A decision of the PRRB is final unless the Secretary, on her own motion, and within 60 days after the provider is notified of the PRRB decision, reverses, affirms, or modifies the PRRB's decision. 42 U.S.C. § 1395oo(f). The Secretary has delegated her final authority to modify, affirm, or reverse PRRB decisions to the Administrator of CMS ("Administrator"). 42 U.S.C. 1395oo(f)(1); 42 C.F.R. § 405.1875.

Following a final decision of the PRRB or the Administrator, a provider is entitled to file a civil action in the United States District Court for the District of Columbia to seek judicial review of the final agency action. 42 U.S.C. § 1395 oo(f).

### 2. Medicare Bad Debt Reimbursements

Medicare "bad debts" are unpaid amounts, such as deductibles or copayments, owed by Medicare patients for covered Medicare services. 42 C.F.R § 413.89(e); see also 42 C.F.R. § 413.89(b)(1). These bad debts are deductions from revenue and are not to be included in costs reported by the provider. 42 C.F.R. § 413.89(a). However, the Medicare statute prohibits cost-shifting, which means that costs associated with services provided to Medicare beneficiaries cannot be borne by non-Medicare patients, and vice versa. 42 U.S.C. §

1395x(v)(1)(A)(i); Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 791 (D.C. Cir. 1984) (noting that statute prohibits "cost-shifting" between Medicare and non-Medicare patients). In order to prevent cost-shifting, a provider unable to collect from a Medicare beneficiary can claim the amounts owed as "bad debts" and be reimbursed under Medicare if the provider meets certain criteria specified in 42 U.S.C. § 413.89(e).

According to 42 C.F.R. § 413.89(e), bad debts attributable to unpaid Medicare costs are reimbursable if: (1) the debt is "related to covered services and derived from deductible and coinsurance amounts"; (2) the provider establishes that "reasonable collection efforts were made"; (3) the debt was "actually uncollectible when claimed as worthless"; and (4) "sound business judgment" establishes that there is "no likelihood of recovery at any time in the future." Id. § 413.89(e).

Chapter 3 of the Medicare Provider Reimbursement Manual,[2] Part I ("PRM"), contains the Secretary's interpretation of these Regulations. Catholic Health Initiatives v. Sebelius, 617 F.3d 490, 491 (D.C. Cir. 2010) (noting that PRM contains "guidelines

[2] The Secretary also issues a manual for fiscal intermediaries, known as the Medicare Intermediary Manual ("MIM"). See Albert Einstein Med. Ctr. v. Sebelius, 566 F.3d 368 (3d Cir. 2009) (noting that Secretary issues manuals such as the PRM and MIM "to assist healthcare providers and fiscal intermediaries in administering the [reimbursement] system").

and policies" but "does not have the effect of regulations"). Three sections of the PRM are relevant.

First, PRM section 310 defines a "reasonable collection effort" of Medicare debts as one that is "similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients." Administrative Record ("AR") 254. It specifically provides that a "provider's collection effort may include the use of a collection agency." Id.

Second, PRM section 310.2 sets forth a "presumption of noncollectibility," which establishes that if, after reasonable and customary attempts to collect the unpaid amounts have failed, the debt remains unpaid more than 120 days from the date the first bill was mailed to the Medicare beneficiary, the debt "may be deemed uncollectible." AR 255.

Third, PRM section 316 establishes a system to ensure that any debts deemed uncollectible that are later recovered by the provider are subtracted from benefits due to the provider in the reporting period in which those payments are recovered. AR 279.

### 3.    The Medicare Bad Debt Moratorium

In 1987, Congress enacted what became known as the "Bad Debt Moratorium." See Foothill Hosp.-Morris L. Johnston Mem'l v. Leavitt, 558 F. Supp. 2d 1, 3 (D.D.C. 2008) ("Foothill") (citing Hennepin Cty. Med. Ctr. v. Shalala, 81 F.3d 743, 747 (8th Cir.

1996)) (noting that Congress enacted the Moratorium in response

to the policy changes proposed by the Inspector General of

Health and Human Services).[3] The Moratorium reads:

> (c) CONTINUATION OF BAD DEBT RECOGNITION FOR HOSPITAL
> SERVICES. - In making payments to hospitals under
> title XVIII of the Social Security Act, the Secretary
> of Health and Human Services shall not make any change
> in the policy in effect on August 1, 1987, with
> respect to payment under title XVIII of the Social
> Security Act to providers of service for reasonable
> costs relating to unrecovered costs associated with
> unpaid deductible and coinsurance amounts incurred
> under such title (including criteria for what
> constitutes a reasonable collection effort).

Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203

§ 4008, 101 Stat. 1330 (reprinted in 42 U.S.C. § 1935f note).

In 1988, Congress amended the Moratorium to further define

"reasonable collection effort," defining the term to include

"criteria for indigency determination procedures, for record

keeping, and for determining whether to refer a claim to an

external collection agency." Technical and Miscellaneous Revenue

Act of 1988, Pub. L. No. 100-647 § 802, 102 Stat. 3798

(reprinted in 42 U.S.C. § 1935f note).

In 1989, Congress amended the Moratorium again. It added

the following sentence: "The Secretary may not require a

hospital to change its bad debt collection policy if a fiscal

---

[3] Foothill contains a detailed review of the legislative history
of the Moratorium and its subsequent amendments. 558 F. Supp. 2d
at 2-3.

intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy." Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6023, 103 Stat. 2106 (reprinted in 42 U.S.C. § 1935f note).

Thus, the Moratorium, as amended, contains two restrictions on the Secretary. First, the Secretary is prohibited from making any changes to the agency's bad debt policy in effect on August 1, 1987. See Foothill, 558 F. Supp. 2d at 5-9 (rejecting the Secretary's argument that she "is free to make changes to [her] own policies and is restricted only in modifying the individual policies of individual Medicare providers" in light of the clear statutory text and the court's view of the historical context in which the statute was passed). Second, the Secretary is prohibited from requiring a provider to change bad debt policies it had in place on August 1, 1987. Id. at 4 (noting that the Bad Debt Moratorium "clearly prevents the Secretary from changing a provider's established bad debt policy"); see also Univ. Health

Servs., Inc. v. Health & Human Servs., 120 F.3d 1145, 1147-48 (11th Cir. 1997).

**B.  Factual and Procedural History**

Plaintiffs submitted cost reports that included claims for bad debts to their fiscal intermediaries in fiscal year 2003, 2004, and 2005. AR 60. These alleged bad debts included unpaid deductibles and coinsurance amounts that had been sent to an outside collection agency after 120 days of internal collection efforts. AR 60, 230-32, 236. Plaintiffs' fiscal intermediary issued NPRs disallowing these claimed bad debts, declaring that "an ongoing collection effort at [an] outside collection agency indicated that the bad debts were not yet deemed worthless." AR 60.

Plaintiffs timely appealed the NPRs to the PRRB, challenging the disallowance of the bad debts. AR 60. On May 27, 2011, the PRRB issued a unanimous decision holding that Plaintiffs properly claimed the uncollectible accounts as bad debts even though the accounts were still at an outside collection agency. Univ. Health Servs., Inc. v. BlueCross BlueShield Ass'n, Case No. 07-0084GC, 2011 WL 2574339 (P.R.R.B. May 27, 2011).

On June 20, 2011, the Administrator notified the parties that she intended to review the PRRB's decision under 42 C.F.R.

-9-

§ 405.1875. AR 51-52. The parties submitted comments to the Administrator. AR 19-50. On July 26, 2011, the Administrator issued a decision reversing the PRRB and upholding the fiscal intermediary's adjustments disallowing Plaintiffs' claimed bad debts. Univ. Health Servs., Inc. v. Blue Cross Blue Shield Ass'n, 2011 WL 4499597 (H.C.F.A. Admin. Dec. July 26, 2011) ("Administrator Decision").

The Administrator ruled that the PRRB erred when it concluded that the Bad Debt Moratorium was applicable in this case. Id. at *9. She observed that CMS policy establishes that "when a provider sends uncollected amounts to a collection agency, the provider cannot establish reasonable collection efforts have been made, the debt was actually uncollectible when claimed as worthless[,] and that there is no likelihood of recovery."[4] Id. at *8. The Administrator therefore concluded that CMS has "always required that a provider demonstrate that its collection efforts were reasonable and, therefore, there has been no change in CMS policy." Id. at *9.

As permitted by 42 U.S.C. § 1395oo(f), Plaintiffs timely filed a Complaint on September 23, 2011 [Dkt. No. 1] seeking review of the Administrator's decision. Plaintiffs filed their

---

[4] For ease of analysis, this Court shall refer to the Secretary's position, that an account that is outstanding at an outside collection agency is per se not uncollectible and thus cannot be claimed as a bad debt, as the "presumption of collectability."

Opening Brief on March 9, 2012. Defendant filed her Motion for Summary Judgment and Opposition to Plaintiffs' Opening Brief on April 25, 2012. Plaintiffs then filed their Opposition and Reply Brief on June 11, 2012, and Defendant filed her Reply to Plaintiffs' Opposition and Reply to Defendant's Motion for Summary Judgment on August 9, 2012. The joint appendix was filed on August 23, 2012 [Dkt No. 30], and this matter is now ripe for review.

## II.  STANDARD OF REVIEW

The Medicare Act provides for judicial review of a final decision made by the PRRB or the Secretary. 42 U.S.C. § 1395oo(f)(1). It instructs the reviewing court to apply the provisions of the APA. Id. Because this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the Administrative Record. Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); Richards, 554 F.2d at 1177 ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record.").

Under the APA, an agency decision is set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" and its factual findings are only overturned if "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); see also Murray Energy Corp. v. F.E.R.C., 629 F.3d 231, 235 (D.C. Cir. 2011) (quotation and citation omitted). It is well established in our Circuit that this court's review of agency action is "highly deferential." Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (citations and internal quotation marks omitted). If the "agency has rationally set forth the grounds on which it acted, . . . this court may not substitute its judgment for that of the agency." BNSF Ry. Co. v. Surface Transp. Bd., 604 F.3d 602, 611 (D.C. Cir. 2010) (internal quotation and citation omitted). However, this Court must ensure that the agency has "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig., _ F.3d. _ , 2013 WL 765059, at *6 (D.C. Cir. Mar. 1, 2013) (quoting Keating v. F.E.R.C., 569 F.3d 427, 433 (D.C. Cir. 2009)).

When determining if substantial evidence supports an agency's factual finding, "weighing the evidence is not the court's function." United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, v. Pension Ben. Guar. Corp., No. 12-5116, 2013 U.S. App. LEXIS 731, at *14

(D.C. Cir. Jan. 11, 2013). Instead, the question is "whether there is such relevant evidence as a reasonable mind might accept as adequate to support the agency's finding." Id. (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)) (internal quotation marks omitted).

## III. ANALYSIS

Plaintiffs make three arguments in support of vacating the Administrator's decision. Their primary argument, which is dispositive, is that the presumption of collectability did not exist prior to 1987. Therefore, application of that policy to disallow their claimed bad debts violates the first prong of the Bad Debt Moratorium prohibiting the Secretary from changing the agency's bad debt policies.[5]

### A.  The Presumption of Collectability Violates the First Prong of the Bad Debt Moratorium

The first prong of the Bad Debt Moratorium prohibits the Secretary from making any changes to the Department's bad debt policy in effect on August 1, 1987. See Foothill, 558 F. Supp. 2d at 5-9. As already noted, the Administrator concluded that

---

[5] Because the Court concludes that the Administrator erred when she determined that there was no change in policy in violation of the Bad Debt Moratorium, the Court need not address Plaintiffs' argument that the Administrator's decision failed to allow the hospital to claim the debts based on the second, hospital-specific prong of the Bad Debt Moratorium. For the same reason, it is not necessary to address whether the presumption of collectability is arbitrary and capricious. See Foothill, 558 F. Supp. 2d at 11 n.17.

the presumption of collectability was in place prior to the effective date of the Moratorium and accordingly upheld the intermediary's denial of the Plaintiffs' claims on this basis. Administrator Decision, 2011 WL 4499597, at *9-*10. However, for the reasons set forth below, the Court concludes that the Administrator's finding was not supported by substantial evidence. See 5 U.S.C. § 706(2)(E) (factual conclusions may be overturned only where they are "unsupported by substantial evidence").[6]

### 1.    The Record Evidence Cited by the Secretary Does Not Support the Administrator's Finding

The Secretary argues that the Regulations, various PRM provisions, a particular 1989 MIM provision, two memoranda from 1990, a 2008 CMS Joint Signature Memorandum, and various decisions of the Administrator provide substantial evidence that the presumption of collectability existed prior to the enactment of the Moratorium. Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. & Opp'n to Pls.' Opening Br. 21-22 [Dkt. No.

---

[6] The Foothill court addressed the same issue and came to the same conclusion. Foothill, 558 F. Supp. 2d at 10-11 (finding that the presumption of collectability was indeed "a change in policy, for this policy did not exist prior to the effective date of the Moratorium"). The Secretary filed an appeal of Foothill in our Court of Appeals, but withdrew it prior to briefing. Foothill Hosp.-Morris L. Johnson Mem'l v. Leavitt, No. 08-5224, 2008 WL 4562209 (D.C. Cir. Sept. 19, 2008).

19-1]; Def.'s Reply to Pls.' Opp'n & Reply to Def.'s Mot. for Summ. J. 17. The Court addresses each in turn.

### a.   42 C.F.R. § 413.89

The Regulation at issue, 42 C.F.R. § 413.89, was issued in 1966, and thus predates the Moratorium.[7] However, the Regulation does not establish the presumption of collectability nor address the use of collection agencies. It does not define "reasonable collection efforts," "actually collectible," or "sound business judgment." See <u>GCI Health Care Ctrs., Inc. v. Thompson</u>, 209 F. Supp. 2d 63, 69 (D.D.C. 2002).

The Secretary's response is that the presumption of collectability is "inherent" in the Regulation. But the very wording of the Regulation fails to support such an interpretation. Rather than being "inherent" in the Regulation, the presumption of collectability simply represents the Secretary's current interpretation of the Regulation.[8] <u>See</u>

---

[7] 42 C.F.R. § 413.89 was originally codified in 1966 as 42 C.F.R. § 405.420. Principles for Reimburseable Costs, 31 Fed. Reg. 14,808, 14,813 (Nov. 22, 1966). In 1986, it was redesignated as 42 C.F.R. § 413.80. Redesignation of Reasonable Cost Regulations, 51 Fed. Reg. 34,790, 34,790 (Sept. 30, 1986). In 2004, it was again redesignated and became 42 C.F.R. 413.89. Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48,916, 49,254 (Aug. 11, 2004).

[8] While the parties vigorously dispute the level of deference that should be accorded the Secretary's current interpretation,

Foothill, 558 F. Supp. 2d at 10 (noting that the Secretary was confusing the Regulation with his interpretation of the Regulation).

### b.   PRM Provisions

The Secretary also argues that the PRM provisions, on their face, establish the presumption of collectability. However, the language of the PRM does not set forth any such presumption, and, in fact, tacitly contradicts it. PRM section 310 specifies that the use of collection agencies by providers can be part of a "reasonable collection effort."  PRM section 310.2 states that if "reasonable and customary attempts" to collect a debt have not been successful in 120 days, the debt is entitled to a presumption of noncollectibility.  This provision does not exclude debts that remain at collection agencies.  Taken together, the two PRM sections obviously contemplate the possibility that debts which remain at a collection agency for more than 120 days may be deemed noncollectible. Thus, section 310 and section 310.2 do not support the Secretary's position. See Foothill, 558 F. Supp. 2d at 11.

### c.   1989 MIM Transmittal No. 28

The Secretary also argues that a MIM transmittal letter from September 1989 supports her position that the presumption

that question is irrelevant to the threshold issue of when the interpretation became the Secretary's policy.

of collectability existed prior to 1987. The document, identified as Transmittal No. 28, set out "New Policy" to be used by intermediaries for audits performed after October 12, 1989. AR 289. Exhibit A-11 in the transmittal specified:

> If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the day of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

AR 315. This is the first time that the presumption of collectability actually appeared in writing, and this was two years <u>after</u> the Bad Debt Moratorium went into effect.

Clearly, the fact that this is the first publication of the presumption of collectability, and that it was issued well after passage of the Moratorium, weighs against the Secretary's assertion that the presumption predated the Moratorium. Plaintiffs emphasize that the transmittal specifically identified itself as setting forth "New Policy." Thus, the transmission, by its own terms actually contradicts the Secretary's argument. See <u>Foothill</u>, 558 F. Supp. 2d at 10 (finding that the transmittal letter was "[t]ellingly" labeled as a new policy and thus was a "new rule when it was enacted in

1989, several years after the Bad Debt Moratorium").[9] In sum, the
language of the 1989 MIM Transmittal does not support the
Administrator's conclusion that it contained an established
policy with regard to the collectability of bad debts.

### d. 1990 Health Care Financing Administration Memoranda

The Secretary argues that two memoranda written by Health
Care Financing Administration ("HCFA")[10] personnel in 1990
support her argument. First, the Secretary points to a June 11,
1990, Memorandum to regional administrators entitled

---

[9] The Secretary argues that, while the transmittal did set forth
some new policies, it was transmitting established policy with
respect to "pass-through reasonable cost reimbursement issues
such as bad debts." Administrator Decision, 2011 WL 4499597, at
*7 n.10 (finding that exhibit was "transmitting new policy with
respect to some IPPS issues" but also "transmitting established
policy"). The Administrator's conclusion was based on language
on the front page of the transmission stating that the revisions
addressed "significant and/or recurring issues." AR 289.

Medicare reimbursement policy regarding bad debts was and
clearly still is a recurring issue. See Foothill, 558 F. Supp.
2d at 3 (citing Hennepin, 81 F.3d at 747) (describing how the
"government has been struggling with this issue for decades" and
noting that its "actions have often been inconsistent"). This
language thus provides no additional support for the Secretary.
Moreover, the Administrator conceded that there was at least
some "new policy" embodied in the transmittal. Administrator
Decision, 2011 WL 4499597, at *7 n.10 (stating that "IPPS
Exhibit A shows certain 'new policies'"). However, she did not
explain how she distinguished the "new" policy from the
"established" policy.

[10] CMS was formerly known as the Health Care Financing
Administration. St. Luke's Hosp. v. Sebelius, 611 F.3d 900, 901
n.1 (D.C. Cir. 2010) (citation omitted).

"Clarification on Bad Debt Policy," which stated that HCFA "always believed" that "there is a likelihood of recovery for an account sent to a collection agency." AR 369. However, a close look at the language of the Memorandum in its entirety squarely contradicts her assertion that the presumption of collectability was clearly in place in 1990, much less before the Moratorium became effective three years earlier in 1987.

The Memorandum began by stating that HCFA had "reexamined" its position on the collectability of accounts at collection agencies in light of the Moratorium and the fact that "a debt referred to a collection agency can sometimes be considered as pending indefinitely." AR 369. Its analysis included the following passage:

> We believe that an intermediary could reasonably have interpreted the title of section 310.2, Presumption of Noncollectability, to provide that an uncollectible account could be presumed to be a bad debt if the provider has made a reasonable and customary attempt to collect the bill for at least 120 days even though the claim has been referred to a collection agency. Such an interpretation is reasonable unless it is apparent that the debt is not a bad debt, for example, because the beneficiary is currently making payments on account, or has currently promised to pay the debt. As noted above, section 310.2 provides that the debt may be deemed uncollectible rather than that the debt "shall" or "must" be deemed uncollectible. On the contrary, "may" connotes the existence of discretion. Thus, even after 120 days, a debt should not be deemed uncollectible when there is reason to believe that in fact it is collectible. However, the mere fact that a debt is referred to a collection agency after the

-19-

> provider's in-house collection effort is completed
> does not mean that the debt is collectible.

AR 370 (emphasis in original).

There are two important points to be drawn from this passage. First, the Memorandum recognizes that an intermediary could "reasonably" interpret the PRM differently, which contradicts the Secretary's position in this litigation that the PRM clearly establishes the presumption of collectability. Second, the Memorandum stated that this alternate interpretation is reasonable except in specific circumstances where there are reasons beyond an account's referral to a collection agency to believe that the debt will be collected. AR 370 (setting out examples of specific circumstances such as where "the beneficiary is currently making payments on account, or has currently promised to pay the debt"). It then declared that "the mere fact that a debt is referred to a collection agency after the provider's in-house collection effort is completed does not mean that the debt is collectible." These statements directly contradict the presumption of collectability, which posits that the "mere fact" that an account has been referred to a collection agency makes it per se not uncollectible.

Second, the Memorandum explicitly recognized that HCFA had failed to issue any directives to intermediaries expressing this policy prior to 1987. It stated:

> Therefore, where an intermediary . . . applied section 310.2 to permit an allowable Medicare bad debt for an account sent to a collection agency, consistent with the provider's procedures for non-Medicare patients, the moratorium would prohibit the intermediary from applying the policy differently despite HCFA directives to the contrary dated subsequent to August 1, 1987.

AR 370. This passage reflected the Secretary's interpretation of the Moratorium to only prevent an intermediary -- not the agency itself -- from changing its policies. See Foothill, 558 F. Supp. 2d at 4 (noting that Secretary argued that he "is free to make changes to his own polices and is restricted only in modifying the individual policies of individual Medicare providers"). At no point in the Memorandum did HCFA identify any pre-1987 evidence that this interpretation existed prior to the Moratorium. Moreover, this sentence acknowledged that the only "directives" that might have informed the intermediary on this issue were released "subsequent to August 1, 1987." Thus, the Memorandum taken as a whole does not support the Secretary's position.

The Secretary attempts in her Motion for Summary Judgment to "bolster" the weight of the June 1990 Memorandum by

referencing a March 20, 1990, Memorandum from the CMS Director
of the Office of Quality Control Programs. See Def.'s Mem. of P.
& A. in Supp. of Def.'s Mot. for Summ. J. & Opp'n to Pls.'
Opening Br. 20 n.10. This Memorandum was not included in the
Administrative Record and therefore need not be considered.[11]

However, even if the Court were to consider the March 1990
Memorandum, it neither "bolsters" the June Memorandum nor
supports the Secretary's position. The Memorandum stated that
HCFA "has had a long standing policy on when providers could
claim bad debts" but failed to identify any pre-1987 evidence
that supported that conclusion. Thus, even if the Court were to
consider this March Memorandum, it would not "bolster" the
weight of the June Memorandum, nor support the Secretary's
contention that the presumption of collectability was in place
prior to 1987.

---

[11] Despite having already used the appropriate procedure to
supplement the Administrative Record in this case to include the
2008 Joint Statement Memorandum, see Def.'s Mot. for Leave to
Supplement the Admin. Record [Dkt. No. 17], the Secretary did
not follow such procedure with the March 1990 Memorandum.
Instead, it attached it to its initial filing as an exhibit. The
Court notes that its "[r]eview is to be based on the full
administrative record that was before the Secretary at the time
he made his decision." Walter O. Boswell Mem. Hosp., 749 F.2d at
792 (emphasis in original) (quoting Citizens to Preserve Overton
Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971)).

### e.    2008 CMS Joint Statement Memorandum

The Secretary also argues that the May 2, 2008, CMS Joint Statement Memorandum ("JSM") supports the Administrator's finding. The JSM's self-stated purpose was to "clarify longstanding policy concerning reimbursement for a Medicare bad debt while the account is at a collection agency." Supplemental AR 1. However, like the earlier memoranda just discussed, the JSM actually contradicts the Secretary's position.

First, the JSM cited no pre-1987 evidence in support of its statement that the presumption of collectability was in place prior to the Moratorium. Second, the JSM directly contradicted the June 1990 Memorandum by asserting that the PRM clearly establishes the presumption of collectability. In addition, the June 1990 Memorandum explicitly told intermediaries who had permitted providers to claim bad debts outstanding at collection agencies that they not only could, but must, continue to allow such bad debts pursuant to the Moratorium. The JSM, in contradiction, declared such actions to be "not in accordance with the regulations" and instructed intermediaries to apply the presumption of collectability. Supplemental AR 2. The JSM demonstrates that, twenty years after the Moratorium went into effect, the agency had still not succeeded in adequately communicating or implementing a policy that it claims was in

-23-

place for over forty years. The JSM does not support the Secretary's position.

### f.   CMS Administration Decisions

Finally, the Secretary argues that various Administrator decisions support her decision. First, she identifies six Administrator decisions[12] between 1992 and 1997 which allegedly demonstrate the Administrator's consistent "position that accounts pending at collection agencies cannot be deemed worthless." Def.'s Reply to Pls.' Opp'n & Reply to Def.'s Mot. for Summ. J. 7-8. First, all these cases postdate the Moratorium by several years. Second, all of these cases deal with the separate issue of whether both Medicare and non-Medicare accounts must be sent to a collection agency for the provider to claim the Medicare accounts as bad debts. These decisions do not address when in the process the provider can claim such accounts as bad debts, and thus, are not applicable.

---

[12] <u>Baystate Med. Ctr. v. Aetna</u> (H.C.F.A. Admin. Dec. Aug. 4, 1997) [Dkt. No. 28-1 pp. 58-65]; <u>Arlington Hosp. v. Blue Cross Blue Shield Ass'n</u>, 1997 WL 420393 (H.C.F.A. Admin. Dec. June 13, 1997) [Dkt. No. 28-1 pp. 49-57]; <u>Detroit Receiving Hosp. & Univ. Health Ctr. v. Blue Cross and Blue Shield Ass'n</u>, 1996 WL 887671 (H.C.F.A. Admin. Dec. Oct. 7, 1996) [Dkt. No. 28-1 pp. 41-48]; <u>Mem'l Hosp. of Dodge Cty. v. Blue Cross & Blue Shield Ass'n</u> (H.C.F.A. Admin. Dec. March 22, 1996) [Dkt. No. 28-1 pp. 31-40]; <u>Univ. Hosp. v. Blue Cross & Blue Shield Ass'n</u> (H.C.F.A. Admin. Dec. Aug. 21, 1995) [Dkt. No. 28-1 pp. 21-30]; <u>Humana Hosp. v. Aetna Life Ins. Co.</u> (H.C.F.A. Admin. Dec. Sept. 11, 1992) [Dkt. No. 28-1 pp. 2-10].

Second, the Secretary identifies three fairly recent Administrator decisions that "apply the Secretary's policy in the same manner it has been applied in this case." Def.'s Reply to Pls.' Opp'n & Reply to Def.'s Mot. for Summ. J. 9. In addition to the fact that all of these cases significantly post-date the Moratorium, the decisions were either overturned based on a finding that the presumption of collectability violated the Bad Debt Moratorium or were upheld without addressing the Moratorium issue.

The earliest of the decisions cited by the Secretary is a 2004 case, Battlecreek Health Sys. & Mercy Gen. Health Partners v. Blue Cross Blue Shield Ass'n, 2004 WL 3049346 (H.C.F.A. Admin. Dec. Nov. 12, 2004). The Western District of Michigan affirmed the Administrator's decision, and was upheld by the Sixth Circuit Court of Appeals. Battle Creek Health Sys. v. Thompson, 423 F. Supp. 2d 755, 760 (W.D. Mich. 2006), aff'd, Battle Creek Health Sys. v. Leavitt, 498 F. 3d 401 (6th Cir. 2007). However, as the Foothill court observed, the parties in Battle Creek did not raise, and neither the district court nor the appellate court addressed, the Moratorium. Foothill, 558 F. Supp. 2d at 5 n.7.

The second case cited is Mesquite Cmty. Hosp. v. Blue Cross and Blue Shield Ass'n, 2007 WL 1804073 (H.C.F.A. Admin. Dec.

Apr. 18, 2007), which was similarly upheld without addressing the Bad Debt Moratorium. Mesquite Cmty. Hosp. v. Levitt, 3-07-CV-1093-BD, 2008 WL 4148970, at *3 n.4 (N.D. Tex. Sept. 5, 2008) (noting that "[u]nlike the provider in Foothill Hospital, plaintiff makes no argument concerning the Bad Debt Moratorium in this case").

The third case is the Administrator's 2007 opinion in Foothill Presbyterian Hosp. v. Blue Cross & Blue Shield Ass'n, 2007 WL 1004394 (H.C.F.A. Admin. Dec. Feb. 14, 2007). As discussed above, that opinion was overturned by another member of this District Court because she found that the Administrator's determination that the presumption of collectability existed prior to 1987 was not supported by substantial evidence. Foothill, 558 F. Supp. 2d at 11. Thus, these opinions are not persuasive evidence of pre-Moratorium policy.

In sum, the Court has reviewed the evidence cited by the Secretary and finds that it falls far short of the "substantial evidence" on which the Administrator based her contention that the presumption of collectability existed prior to 1987.

2.   **Evidence in the Record Contradicts the
Administrator's Finding that the Presumption of
Collectability Existed Prior to 1987**

The Court must look to "the record as a whole" in reviewing

the Administrator's factual findings. Chippewa Dialysis Servs.

v. Leavitt, 511 F.3d 172, 176 (D.C. Cir. 2007). In this case, a

review of the record, beyond the evidence relied upon by the

Secretary, further contradicts the Administrator's finding.

For instance, a set of audit guidelines in place in 1985,

obviously pre-Moratorium, specifically addressed collection

agencies. AR 360-365. Section 15.04 of the Hospital Audit

Program, located in a manual for intermediaries, explained that:

> Where a provider utilizes the services of a collection
> agency, the provider need not refer all uncollected
> patient charges to the agency, but it may refer only
> uncollected charges above a specified minimum amount.
> If reasonable collection effort was applied, fees the
> collection agency charges the provider are recognized
> as an allowable administrative cost of the provider.

AR 362. It then stated that, "[t]o determine the acceptability

of collection agency services," the intermediary should ensure

"both Medicare and non-Medicare uncollectible amounts are

handled in a similar manner" by the provider, ensure that the

patient's file "is properly documented to substantiate the

collection effort," and determine if the amounts are properly

recorded. AR 362. It is noteworthy that these guidelines set out

step-by-step instructions for intermediaries preparing to audit

a provider's use of collection agencies, but did not state that PRM section 310.2's presumption of noncollectability did not apply to accounts sent to collection agencies.

In addition, the pre-Moratorium provision of the MIM relied on by the Secretary did not prohibit reimbursement while an account was outstanding at a collection agency. AR 367; see Foothill, 558 F. Supp. 2d at 11. Thus, in two major references provided to intermediaries, the Secretary did not mention or allude to any presumption of collectability.

Moreover, a pre-Moratorium Administrator decision, Scotland Mem. Hosp. v. Blue Cross & Blue Shield Ass'n, (H.C.F.A. Admin. Dec. Nov. 9, 1984), directly contradicts the presumption of collectability.   AR   463-464.   In   Scotland   Memorial,   the Administrator noted that the presumption of noncollectability established in PRM section 310.2 deserved "more weight than the subjective and unrealistic opinion of the provider's witness, who felt the bad debts were not uncollectible because she expected the collection agency to collect them." AR 464. Thus, as of 1984, the presumption of noncollectability in section 310.2 applied to accounts that had been sent to collection agencies.

Finally, in a 1995 case, the Administrator approved a bad debt claim even though the debt had been given to an outside

-28-

collection agency that had not yet terminated its efforts. Lourdes Hosp. v. Blue Cross & Blue Shield Ass'n, (H.C.F.A. Admin. Dec. Oct. 27, 1995). AR 271-275. While Lourdes, like many of the Administrator decisions cited above, significantly post- dates the Moratorium, it demonstrates that the presumption of collectability was not firmly established even eight years after the Moratorium went into effect.

The Court is mindful that review of a final agency decision is "highly deferential," Bloch, 348 F.3d at 1070, and understands that "weighing the evidence is not the court's function." United Steel, 2013 U.S. App. LEXIS 731, at *14. However, considering that the Secretary has pointed to no persuasive evidence that supports her contention, much less pre- 1987 evidence, and that the only pre-1987 evidence that has been identified by the parties contradicts the Secretary's position. there is not "such relevant evidence as a reasonable mind might accept as adequate to support" her conclusion. Id. (citation omitted). Accordingly, the Court must conclude that the record does not contain substantial evidence to uphold the Administrator's determination that the intermediary appropriately disallowed the Plaintiffs' bad debt claims.

## IV. REMEDY

Plaintiffs request that the Court "reimburse Plaintiffs for the bad debt claims on their fiscal year 2003, 2004 and 2005 cost reports, including interest." Proposed Order [Dkt. No. 14-1]. As noted in Foothill, however, the appropriate remedy is a remand to the Agency. See Foothill, 558 F. Supp. 2d at 11 (quoting Palisades Gen. Hosp. Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005)) (observing that once District Court has determined that agency made an error of law, the case must be remanded to the agency for further proceedings).

Thus, because the Court finds that the Administrator's factual determination that the presumption of collectability existed prior to 1987 was not supported by substantial evidence, the Court vacates the Administrator's decision and remands the case to the Secretary for further proceedings consistent with this ruling.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is **granted** and Defendant's Motion for Summary Judgment is **denied**. An Order shall accompany this Memorandum Opinion.

March 26, 2013

/s/ Gladys Kessler
Gladys Kessler
United States District Judge

-30-